UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

SHIRLEY HARWOOD          )
                                    )        NO. 2:05-CV-114
v.                                )        NO. 2:01-CR-76
                                    )        NO. 2:02-CR-28
                                    )
UNITED STATES OF AMERICA   )

## MEMORANDUM OPINION and ORDER

      This matter is before the Court to address the petitioner's Motion to Vacate, Correct or Set Aside a Sentence Pursuant to 28 U.S.C. § 2255. The only ground asserted by the petitioner is that her conviction must be vacated because she had ineffective assistance of counsel.[1]

      On April 29, 2002, the petitioner pled guilty to four counts of a twelve count indictment in case No. 2:01-CR-76. Count 1 charged her with a conspiracy to defraud; Count 2 charged her with mail fraud;  Count 10  charged her with wire fraud; and Count 11 charged her with money laundering. This indictment was the a result of a sophisticated and complicated scheme involving the petitioner and her employee in the creation of false

---

[1] Indeed, the only claims which can be raised by the petitioner are claims of ineffective assistance of counsel and prosecutional misconduct. Pursuant to the terms of her plea agreement with the government, she has waived the right to pursue any other grounds.

and forged documents to secure a $4.5 million dollar loan from Credit Suisse.[2]

---

[2]

      The parties stipulated that had this matter proceeded to trial, the Government could have proven the following facts beyond a reasonable doubt:

1.     From in or about 1993 through in or about 2001, defendant SHIRLEY HARWOOD ("HARWOOD") of Kingsport, Tennessee, was the owner and president of Apple Tree Mortgage, a mortgage and loan brokerage company located in Kingsport, Tennessee. From in or about 2000 through in or about 2001, defendant HARWOOD supervised co-defendant DENNIS RAY SUTHERLAND, JR. ("SUTHERLAND"), one of the brokers employed by Apple Tree Mortgage. Defendant HARWOOD was paid a salary by Apple Tree Mortgage, and received substantial additional compensation from Apple Tree Mortgage when loans were successfully brokered by the company.

2.     Beginning in or about November 2000, defendant HARWOOD enlisted co-defendant SUTHERLAND's assistance in brokering a loan for a joint venture between a California company (Ilaid Energy Group) and a Swiss company (HelveStar) (hereinafter collectively known as "the borrower"). Defendants HARWOOD and SUTHER-LAND understood that Apple Tree Mortgage would earn a commission and would have the right to earn additional commissions on later loans if it successfully obtained bridge-loan financing for the borrower. In addition, defendant HARWOOD would receive a substantial commission if she was able to successfully complete the task.

3.     Defendant HARWOOD advised defendant SUTHERLAND that Apple Tree Mortgage needed to obtain collateral for the borrower to use to obtain a short-term bridge loan of approximately $5 million (hereinafter "the bridge loan"). After contacting several banks, co-defendant SUTHERLAND advised defendant HARWOOD that no bank would issue such collateral without money on deposit. Apple Tree Mortgage did not have much money on deposit.

4.     Defendants HARWOOD and SUTHERLAND agreed to create false forged documents to make it appear as if the borrower had collateral that could be used to secure the bridge loan. The defendants also agreed to falsely represent to the borrower and potential lenders that this collateral was genuine.

5.     Co-defendant SUTHERLAND traveled to the Kingsport branch of the Bank of America and obtained Bank of America letterhead under false pretenses. Co-defendant SUTHERLAND used a color photocopier to create forged Bank of America stationary with this letter-head. Defendants HARWOOD and SUTHERLAND created false and forged "payment obligations" and "letters of credit" that appeared to have been issued from Bank of America. The defendants signed these false and fraudulent documents in the names of real and fictitious Bank of America employees. In particular, defendant HARWOOD forged the signature of a ficti-

tious Bank of America employee named "Kimberly Rogers," and co-defendant SUTHERLAND forged the signature of a fictitious Bank of America vice president named "James Sullivan." Defendant was aware that these documents, and any reference to "Kimberly Rogers," "James Sullivan" or Bank of America in conversations with potential lenders, was false and fraudulent.

6.      Some of these false and fraudulent documents were provided to Credit Suisse in Switzerland and New York in order to convince Credit Suisse to lend approximately $4,500,000.00 to the borrowers. In particular, defendant HARWOOD caused several versions of a forged document entitled "Payment Obligation No. 25," which appeared to originate from Bank of America, to be faxed by defendant SUTHERLAND from Apple Tree Mortgage's office in Kingsport, Tennessee, to Credit Suisse's office in Lausanne, Switzerland. When sending these faxes, defendant SUTHERLAND altered the fax machine to make it appear as if the documents originated from Bank of America.

7.      Defendants caused a forged document entitled "Payment Obligation No. 25" to be sent by Airborne Express, a private and commercial interstate carrier, from the Eastern District of Tennessee to Credit Suisse's offices in New York and Switzerland. Both the faxes and the mail delivery of "Payment Obligation No. 25" were in furtherance of the scheme to defraud Credit Suisse, and were material to the credit decision that Credit Suisse was preparing to make concerning the bridge loan.

8.      Defendant HARWOOD knew that co-defendant SUTHERLAND has a mobile telephone that had been issued to Apple Tree Mortgage. The defendants agreed that co-defendant SUTHERLAND would answer any calls placed to that phone as if he was Bank of America vice president "James Sullivan." The defendants listed the telephone number for this mobile phone on "Payment Obligation No. 25" as the direct telephone number for Bank of America vice president "James Sullivan."

9,      In or about November and December, 2000, co-defendant SUTHERLAND pretended to be "James Sullivan" of Bank of America during numerous telephone conversations regarding the funding of a bridge loan to the borrowers. In particular, on or about November 28, 2000, December 1, 2000, and December 4, 2000, co-defendant SUTHERLAND pretended to be "James Sullivan" during telephone conversations with representatives of Credit Suisse in Switzerland. These conversations were material to the credit decision that Credit Suisse was preparing to make concerning the bridge loan.

10.     Defendant SUTHERLAND and HARWOOD also created a false and fraudulent certification concerning the authority of "Kimberly Rogers" and "James Sullivan" to sign "Payment Obligation No. 25" on behalf of Bank of America. The defendants then placed forged signa-

On June 3, 2002, the petitioner pled guilty in case No. 2:02-CR-28 to Counts 1 through

11 of a seventeen count indictment that charged her with bank fraud and money

laundering offenses. The conduct which led to this indictment involved fraudulent loans

tures of "James Sullivan" and a true Bank of America
employee on this certification. The real Bank of
America employee named in this letter had not ap-
proved the issuance of this certification, and did
not authorize the defendants to use her signature on
this document. The defendants caused this certifica-
tion to be sent by facsimile transmission from Apple
Tree Mortgage's offices in Kingsport, Tennessee to
Credit Suisse's offices in Lausanne, Switzerland.

11.   Through these acts, defendants SUTHERLAND and HARWOOD
induced Credit Suisse to lend approximately
$4,500,000.00 to the borrowers on or about December
6,2000. From these funds a commission of $237,500.00
was sent by wire to Apple Tree Mortgage's bank
account at Citizen's Bank, Kingsport, Tennessee, from
an escrow agent's account in Atlanta, Georgia, as
payment for the defendants' work in securing the
bridge loan. On or about December 6, 2000, defendant
HARWOOD instructed an employee of Apple Tree Mortgage
to purchase two cashier's checks payable to defendant
HARWOOD from these commission funds:
one check for $100,100.00 and one check for
$9,900.00. In addition, defendant HARWOOD directed
that additional checks and cashier's checks be
created to pay her personal bills and the bills of
Apple Tree Mortgage, including the issuance of a
cashier's check in the amount of $23,507.62 to repay
a loan made by Washington County Bank to defendant
HARWOOD. Defendant HARWOOD instructed that the
remaining funds were to be used to pay the outstand-
ing obligations of Apple Tree Mortgage.

12.   Defendant HARWOOD continued to make false and mis-
leading statements to Credit Suisse even after the
bridge loan was funded in order to prevent Credit
Suisse and other from discovering the fraudulent
scheme. On or about December 27, 2000, in an attempt
to prevent detection of the scheme, defendant HARWOOD
caused the false and fraudulent certification relat-
ing to the signature authority of "Kimberly Rogers"
and "James Sullivan" to be sent by a private and
commercial interstate carrier from the Eastern
District of Tennessee to Credit Suisse's offices in
Lausanne, Switzerland.

13.   The amount of money lost by Credit Suisse attribut-
able to the conduct of defendant HARWOOD and co-
defendant SUTHERLAND was approximately $4,500,000.00.
The amount of funds fraudulently obtained by defen-
dant HARWOOD and defendant's employer Apple Tree
Mortgage, was $237,500.00, of which $10,000.00 was
paid to co-defendant SUTHERLAND.

and real estate transactions with fictitious borrowers to receive loan proceeds from Union

Planters Bank. [3]

The petitioner's presentence report (PSR) was disclosed to her on July 16,

2002, and it was revised on December 9, 2002, to delete the three level reduction in

offense level for acceptance of responsibility. Numerous objections to the probation

officer's calculation of the guideline range were filed by both the government and the

defendant and hearings on the objections were held on February 3, 2003, and April 28,

2003. The defendant was sentenced on May 19, 2003, to 60 months imprisonment on

Counts 1, 2, and 10 and to 97 months on Count 11 in No. 2:01-CR-76 and 97 months on

Counts 1-11 in No. 2:02-CR-28, with all terms to run concurrently. She also was

---

[3]    The Agreed factual basis in this case reflects the following stipulated facts:

> On July 28, 1998, the defendant SHIRLEY HARWOOD, in the capacity of President of Apple Tree Mortgage entered into a $3,000,000 mortgage warehouse loan and security agreement with Union Planters Bank (UP). UP was a financial institution with a main office in Memphis, Tennessee. The bank would advance funds to Apple Tree to make a mortgage loan to an individual borrower. Apple Tree and HARWOOD were to submit a wire transfer request to UP on each loan. The bank would then wire the loan proceeds to a title company for the benefit of the borrower.

> Between July 1998 until about December 1999, HARWOOD defrauded UP by creating fraudulent mortgage loans and real estate transactions with "fictitious borrowers" and non-existent addresses, supported with documents containing forged and unauthorized signatures and false financial, legal and tax information. HARWOOD would submit wire transfer requests from Apple Tree in the name of a "fictitious borrower" to UP under the line of credit and receive the proceeds through a title company. In order to conceal the fraudulent nature of the loans and real estate transactions, HARWOOD would provide bogus mortgage loan files to UP to support the wire transfer requests. HARWOOD then would convert the fraudulently obtained loan proceeds in the amount of approximately $2,005,150.00 through domestic and foreign accounts for her own use and benefit.

sentenced to serve a term of 3 years of supervised release as to Counts 1, 2, 10, and 11 in

No. 2:01-CR-76 and to 5 years of supervised release as to Counts 1-11 in No.

2:02-CR-28, with all terms to run concurrently.   She was ordered to pay restitution of

$3,309,817.00 to Credit Suisse and $2,005,150.00 to Union Planters Bank.[4]

       The petitioner has requested an evidentiary hearing and appointment of

counsel in her motion.  Because this Court has determined that the files and records of the

case conclusively show that the petitioner is entitled to no relief and that her allegations

are contradicted by the record, the request for an evidentiary hearing is DENIED.  *See*

*Smith v. United States*, 348 F. 3d 545 (6th Cir. 2003); Rule 8, *Rules Governing Section*

*2255 Cases In The United States District Courts*.  Since no evidentiary hearing is required,

petitioner's request for appointment of counsel is likewise DENIED.

## APPLICABLE LEGAL STANDARD

       To establish ineffective assistance of counsel a petitioner must show that (1)

counsel's performance was deficient; and (2) counsel's deficient performance prejudiced

the defendant so as to render the trial unfair and the result unreliable.  *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).

       *Strickland's* prejudice prong presents a heavy burden because a defendant

---

[4]     The petitioner was sentenced, and her direct appeal decided, before the
U.S. Supreme Court's decision in *Booker v. United States*, 543 U.S. 220 (2005), which
made the United States Sentencing Guidelines advisory.  Therefore, she was sentenced
under the prior mandatory scheme.  Based on a total offense level of 30 and a
criminal history category of I, her guideline range was 97 to 121 months.  She
received the lowest possible term of imprisonment under the guidelines.

first must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689.  In addition, a petitioner must show but for errors of counsel, the result of the proceeding would have been different.  *Lynott v. Story*, 929 F. 2d 228, 232 (6th Cir. 1991).  A reviewing court's scrutiny of counsel's performance is highly deferential.  *Cobb v. Perini*, 832 F. 2d 342, 347 (6th Cir. 1987), *cert. denied*, 486 U.S. 1024 (1988).

### 1. Petitioner's claims of ineffective assistance of counsel during the plea negotiation stage.

Petitioner's allegations of ineffective assistance of counsel during plea negotiations are that counsel "never took the time to explain the plea agreement" to her and that he initially led her to believe she would get probation in the case and would serve no jail time and later told her she would only spend a few months in a camp and get probation.  Her allegations, however, lack any credibility and are directly contradicted by the record and plea agreements in her cases.  Petitioner was fully aware that she would be sentenced pursuant to the sentencing guidelines and her plea agreement contained a detailed calculation of her guideline range as follows:

> 4.　The defendant acknowledges and understands that the defendant's case is governed by the Sentencing Guidelines and that any term of imprisonment imposed under the guidelines is nonparolable.  The defendant further

acknowledges and understands that the Court will determine the appropriate sentence under the Sentencing Guidelines and that this determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines set forth in the Sentencing Guidelines. She further understands that pursuant to U.S.S.G. § 6B1.4 <u>Stipulations</u> (Policy Statement), the parties' agreement of facts is not binding on the Court and that the Court will determine the facts relevant to sentencing after reviewing the factual basis for the sentence, the presentence report, any stipulations and agreements of the parties, and any other information it deems relevant. The defendant further understands that if the Court does not accept the recommendations or requests of this plea agreement as to any sentence, the defendant has no right to withdraw her plea under the terms of Rule 11(e)(2), Federal Rules of Criminal Procedure, and withdrawal of her plea is within the discretion of the Court under Rule 32(e), Federal Rules of Criminal Procedure.

See Plea Agreement, Doc. 15, para. 4, No. 2:01-CR-28. See also Doc. 51, para. 8, No. 2:01-CR-76.

Her plea agreement in case No. 2:01-CR-76 also contains the following:

10. **Guideline Calculations**

The parties agree that the following calculations under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are consistent with the facts of this case. These recommendations are made with the understanding that the version of the Guidelines effective on November 1, 2000, would apply to this case. <u>See</u> U.S.S.G. § 1b1.11(B)(1). However, if the Court determines that application of the current version of the Guidelines would not violate the defendant's rights under the *Ex post facto* Clause to the U.S. Constitution,

then the parties understand that the current version of the Guidelines would control.

Although these recommendations are not binding on the probation office or the Court, the parties will jointly recommend that the Court make the following findings and conclusions:

(a)     CONSPIRACY  AND  FRAUD:

      i.      The base offense level is six (6), pursuant to U.S.S.G. § 2F1.1(a).

      ii.      The amount of money lost by Credit Suisse attributable to the conduct of defendant SHIRLEY HARWOOD and co-defendant DENNIS RAY SUTHERLAND, JR. was approximately $4,500,000.00. The amount of funds fraudulently obtained by defendant SHIRLEY HARWOOD and defendant's employer, Apple Tree Mortgage, was $237,500.00. Each party reserves the right to argue to the probation officer and the Court about the appropriate amount of "loss" to be attributed to the defendant pursuant to U.S.S.G. § 2F1.1(b)(1).

      iii.      The offense level is increased by two (2) levels because the offense involved more than minimal planning U.S.S.G. §2f1.1(B)(2).

      iv.      The offense level is increased by two (2) levels because the defendant was an organizer, leader, manager, or supervisor of the criminal activity. U.S.S.G.§ 3b1.1(c).

(b)     ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY:

      i.      The base offense level is seventeen (17), pursuant

to U.S.S.G. § 2S1.2(a).

  ii. The offense level is increased by two (2) levels because the defendant knew that the funds were the proceeds of specified unlawful activity. U.S.S.G. §2S1.2(b)(1)(B).

  iii. The offense level is increased by two (2) levels because the value of the funds laundered exceeded $200,000. U.S.S.G. § 2S1.2(b)(2).

(c) GROUPING: The parties acknowledge that under U.S.S.G. § 3D1.2(d), the fraud offenses and the money laundering offense may be grouped. The offense level applicable to the entire group is the highest level of the counts within the group.

(d) ACCEPTANCE OF RESPONSIBILITY:

  i. The offense level is decreased by two (2) levels because the defendant has demonstrated an acceptance of responsibility for her offense. U.S.S.G. § 3E1.1(a).

  ii. Further, defendant has timely notified the Government of her intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Accordingly, the offense level should be reduced by one (1) additional point pursuant to U.S.S.G. § 3E1.1(b) if the Court determines the offense level to be sixteen (16) or greater prior to the operation of Section 3E1.1(a) and if the Court finds that the defendant has accepted responsibility for her offense.

(e) CRIMINAL HISTORY CATEGORY: If the defendant resolves the instant case at the same time that she resolves Case No. 2:02-CR-28 (E.D. Tenn.), the parties agree that the defendant will be in Criminal

History Category I.

> (f)    CONCURRENT OR CONSECUTIVE SENTENCE:
> If the defendant resolves <u>United States v. Shirley Harwood</u>,
> case No. 2:02-CR-28 (E.D. Tenn.), by way of a guilty plea, the
> government agrees to take no position on whether any term of
> imprisonment imposed in the instant case should be concurrent
> or consecutive to any term of imprisonment imposed in <u>United
> States v. Shirley Harwood</u>, Case No. 2:02-CR-28 (E.D. Tenn.).
>
> The parties agree that the offense level, specific offense
> characteristics, and criminal history category are based upon
> investigation by the United States Probation Office.  It is
> possible that factors unknown to the parties may be considered
> in determining the total offense level and guidelines range.  In
> such an event, however, the defendant would not have the right
> to withdraw her plea of guilty.

Petitioner's testimony during her change of plea hearings is also highly relevant.  During her change of plea hearing in  No. 2:01-CR-76 on April 29, 2002, the defendant answered under oath as follows:

> Q.    OKAY.    NOW, HAS YOUR ATTORNEY EX-
> PLAINED TO YOU THE TERMS OF THE PLEA
> AGREEMENT THAT YOU AND THE GOVERN-
> MENT HAVE ENTERED INTO?
>
> A.    YES, SIR.
>
> Q.    YOU UNDERSTAND WHAT THE PLEA AGREE-
> MENT IS AND WHAT YOU'RE AGREEING TO DO
> AND WHAT THE GOVERNMENT IS AGREEING TO
> DO?
>
> A.    YES, I UNDERSTAND THAT.

Q.    ANYTHING ABOUT IT THAT YOU'D LIKE TO ASK
ME BEFORE WE GO FURTHER OR DO YOU UN-
DERSTAND IT?

A.    I THINK I'VE ASKED BUDDY MORE THAN A LOT
OF QUESTIONS.

On June 3, 2002, during her change of plea hearing in  No. 2:02-CR-28, the

defendant answered under oath as follows:

Q.    OKAY. HAS HE EXPLAINED TO YOU THE TERMS
OF THE PLEA AGREEMENT THAT YOU AND THE
GOVERNMENT HAVE ENTERED INTO?

A.    YES, SIR.

Q.    YOU UNDERSTAND IN THE PLEA AGREEMENT
WHAT YOU'RE AGREEING TO DO AND WHAT
THE GOVERNMENT IS AGREEING TO DO?

A.    YES.

In  *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir.1993), the Sixth

Circuit  held that "a defendant who expressly represents in open court that his guilty plea

is voluntary may not ordinarily repudiate his statements to the sentencing judge,"  and

that  the  defendant  was  not  entitled  to  withdraw  his  guilty  plea  when  his  in-court

statements and plea agreement demonstrated that his plea was entered voluntarily.

Like the defendant in *Todaro*, the petitioner repeatedly confirmed that her guilty pleas

were voluntary, that no promises or threats had been made to induce her plea, and that

she had discussed her plea agreement with her attorney. [5]

Maybe most important to the resolution of this issue is the acknowledgment by petitioner in her plea agreement that she was aware that any sentence estimate by her attorney was not binding on the court. The plea agreement in No. 2:01-CR-76 provides: "The defendant acknowledges that no one has promised or guaranteed what sentence the court will impose. The defendant is aware that the sentence has not yet been determined by the court. The defendant is aware *that any estimate of the probable sentencing range or sentence that the defendant might receive, whether that estimate comes from defendant's attorney,* the government or the probation office, *is a prediction and not a promise, and is not binding on the probation office or the court.*" (emphasis added).

It should also be noted that the petitioner also falsely contends in her motion that she did not see or sign her plea agreement until February 3, 2003. In her motion, she alleges that the plea agreement was presented to by her attorney in Court at the sentencing hearing when the objections to the Presentence Report were heard. [6] In fact, the plea agreements were signed on April 29, 2002 and June 3, 2002 and filed long before the petitioner's sentencing hearing on May 19, 2003. This allegation further illustrates the lack of credibility of petitioner's allegations.

---

[5] In fact, the Court of Appeals for the Sixth Circuit has expressly found that petitioner's guilty plea was knowingly and voluntarily made in this case. The petitioner cannot now argue otherwise. *See United States v. Harwood*, 108 Fed. Appx. 344 (6th Cir. 2004) (not recommended for full text publication).

[6] The first hearing on the objections to the PSR was on February 3, 2003.

The Court FINDS that the record reflects that the guilty pleas were made voluntarily, knowingly and intelligently, and that the petitioner is bound by the responses she gave under oath regarding the knowledge and voluntariness of her pleas. Petitioner's assertion that she was advised incorrectly by her attorney of the guideline sentencing range and of her possible sentence is contradicted by the record and is not credible. Petitioner was fully aware of the statutory penalties for her offenses, was advised that her sentence would be determined in accordance with the sentencing guidelines and was fully aware that any prediction her attorney had made as to the sentence that might be imposed was not binding on the court. The petitioner learned of the guideline range applicable to her case on July 16, 2002, when the PSR was disclosed to her. She filed numerous objections to the PSR and hearings of these objections were held on two different days. At no time prior to or during her sentencing hearing on May 19, 2003, did petitioner ever object to the sentence being imposed. [7] This claim is totally without merit.

2. **Petitioner's claim of ineffective assistance of counsel during the pretrial stage.**

The defendant alleges that her attorney failed to devise a defense to the charges against her, stating that, "there were several defense theories available . . . that would have altered . . ." her sentence. She does not specifically identify these theories

---

[7]    In fact, she declined the opportunity to allocate during sentencing .

or how they might have affected her case. By her own admission, the defendant had already confessed before her attorney was retained and her co-defendant had cooperated with law enforcement and provided extensive inculpatory evidence against the petitioner. A petitioner under § 2255 must set forth specific facts entitling her to relief. Conclusory assertions of a lawyer's alleged deficiencies, without any facts to support such assertions, do not meet the first prong of the *Strickland* test. *Miller v. Straub*, 299 F 3d 570, 578 (6th Cir. 2002); *O'Malley v. United States*, 285 F. 2d 733, 735 (6th Cir. 1961).

Secondly, petitioner's allegation is contrary to her testimony under oath during her change of plea harings. In No. 2:01-CR-76 she answered as follows:

> Q.  OKAY. HAS YOUR ATTORNEY ALSO ADVISED YOU AS TO ANY DEFENSE THAT YOU MIGHT HAVE TO THESE CHARGES IF YOU WENT TO TRIAL?
>
> A.  YES, SIR.

In addition, in No. 2:02-CR-28, she testified as follows:

> Q.  OKAY. HAS YOUR ATTORNEY ADVISED YOU AS TO ANY DEFENSE YOU MAY HAVE TO THESE CHARGES?
>
> A.  YES.
>
> Q.  – – IF YOU ENTERED A PLEA OF NOT GUILTY AND WENT TO TRIAL, HAS HE TOLD YOU WHAT YOUR DEFENSE MIGHT BE?
>
> A.  YES.

Petitioner also alleges that her attorney failed to interview potential witnesses whom she identifies as persons with whom she had done business. She does not explain the content of the testimony of these witnesses or how such testimony could have provided a defense to the fraud charges against her or altered her ultimate sentence. Once again petitioner alleges no facts to support her conclusory allegations. Petitioner has not shown that counsel's performance in this respect was deficient nor has she shown any prejudice from the alleged omissions. This claim is, likewise, without merit.

3. **Petitioner's allegations of ineffective assistance of counsel during the sentencing stage.**

The petitioner has filed a 38 page memorandum in support of her motion pursuant to 28 U.S.C. § 2255. Although difficult to ascertain the totality of the allegations made by petitioner concerning ineffective assistance of counsel at the sentencing stage, it appears that her complaints may be summarized as follow:

(1)    Her counsel was ineffective in not explaining to the Court that petitioner's failure to provide the bankruptcy trustee with her personal financial records and property ownership records was due to the seizure of that documentation by the FBI and the State of Tennessee, resulting in the loss by her of a three level adjustment in her offense level for acceptance of responsibility;

(2)    Her counsel was ineffective by not presenting to the Court a letter from Congressman Jimmy Quillen attesting that he had known petitioner for a number of years and had always found her to be responsible;

(3)    Her counsel was ineffective by failing to raise an *Apprendi* issue as relates to enhancements in her offense level for being a leader of the criminal activity and because the offense involved more than minimal planning;

(4)    Her counsel was ineffective by failing to interview officials from Credit Suisse to determine whether any money had been recovered by it, which allegedly would have reduced the amount of loss and the amount restitution to be paid by petitioner; and

(5)    That she was not informed by her attorney until minutes before sentencing that she was subject to a sentence of 97 months.

The petitioner makes her argument with respect to the loss of the three point reduction in offense level for acceptance of responsibility by stating: "The court based his decision not to give the defendant the acceptance of responsibility as a result of the Chapter 11 in Bankruptcy Court. Therefore, it was left up Attorney Baird to explain the situation to the court even though he was not handling the bankruptcy case." Petitioner's argument fails for two simple reasons. First of all, the court's denial of the three level reduction in the offense level for acceptance of responsibility was not based strictly upon lack of cooperation with the bankruptcy court. The Court's order, dated May 15, 2003, [Doc. 94], reflects:

Taken as a whole, the defendant's conduct since pleading guilty indicates anything but an acceptance of responsibility. The defendant has continued to be uncooperative with the government, with the Probation Office and with the Bankruptcy Court, which is a division of this Court. The Court **FINDS** that the

defendant has deliberately attempted to hide the fruits of her crime by refusing to divulge any information about the $280,000.00 wire transfer she made to a foreign bank, and by "giving away" a $40,000.00 diamond ring.

Likewise, petitioner's allegation that the Court was not informed of her allegation that her records had been seized by government authorities is contradicted by the record. Petitioner's counsel cross examined Bankruptcy Trustee Wayne Walls during the sentencing proceedings and elicited testimony that the petitioner had told him that the FBI seized records from Apple Tree Mortgage and that the petitioner therefore did not have access to those records. FBI Special Agent Sandra Farrow, however, testified that no financial records or property ownership records of petitioner's were among the documents seized by the FBI.

Therefore, the petitioner's allegations that she did not receive a three level reduction in her offense level for acceptance of responsibility because her counsel did not explain to the Court that the defendant's files had been seized by government agents is factually incorrect, is contradicted by the record and is without merit. There was no ineffective assistance of counsel in this regard.

The petitioner's argument with respect to the failure of defense counsel to present the July 1, 1998 letter from Congressman James H. Quillen is without merit and is, in fact, frivolous. Not only does she not attempt to explain how the introduction of this letter could have resulted in a different sentence, the letter itself is vague and carefully

worded and appears to have been relevant only on the question of where within the applicable guideline range the Court should sentence the petitioner. Since the petitioner was sentenced at the bottom of the applicable guideline range, she suffered absolutely no prejudice from counsel's failure to introduce a copy of Congressman Quillen's letter.

The petitioner's allegations concerning *Apprendi* issues lack merit for similar reasons. The record in this case clearly contradicts the petitioner's complaint that her attorney should have objected to enhancements for more than minimal planning and for being a leader of the criminal activity. Petitioner's plea agreement with the government [Doc. 51 in No. 2:01-CR-76] contains petitioner's agreement, quoted above at page 9, that the offense level would be increased by two levels because the offense involved more than minimal planning, U.S.S.G. § 2F1.1(b)(2), and that the offense level would be increased by two levels because the defendant was an organizer, leader, manager, or supervisor of the criminal activity, U.S.S.G. § 3B1.1(c). Petitioner clearly agreed in her plea agreement that such calculations were consistent with the facts of her case and she points to no facts arising after the plea agreement was entered into which would affect those guideline calculations. In addition, the terms of imprisonment imposed in this case were well below the statutory maximum sentences and *Apprendi* was, therefore, not applicable to this case. This issue is totally without merit.

Petitioner also argues that her counsel was constitutionally ineffective by failing to interview witnesses and objects to the amount of loss and the amount of

restitution to be paid by the petitioner. Once again, the record establishes the lack of validity of this claim. The amount of loss to Credit Suisse was thoroughly addressed at the hearing by the Court on February 3, 2003 and was in fact reduced based upon the testimony of FBI Special Agent Tom Simon that Credit Suisse had recovered $1,050,000.00 from one source and received $43,182.89 from another source. The petitioner's attorney thoroughly cross examined Agent Simon on the dollar amounts of the loss and emphasized through his cross examination Harwood's full cooperation with the FBI. This issue is without merit.

Lastly, petitioner, quite incredibly, claims that she did not find out she was subject to a sentence of 97 months until "minutes" before her sentencing. At her sentencing hearing on May 19, 2003, however, she testified under oath as follows:

| THE COURT: | . . . ON SHIRLEY HARWOOD, HAS SHE – – HAVE YOU RE-VIEWED THE PRESENTENCE REPORT WITH YOUR ATTOR-NEY, MS. HARWOOD? |
|---|---|
| MS. HARWOOD: | YES. |
| THE COURT: | YOU SAID YES? |
| MR. BAIRD: | YES. SHE SAID YES, YOUR HONOR. |

The presentence report had been disclosed to the petitioner almost one year before her sentencing and she clearly learned at that time about the enhancements and the recommended guideline range for imprisonment. As mentioned earlier, petitioner's counsel filed numerous objections and several hearings were held by the Court on those objections. Petitioner made absolutely no objection at the time of sentencing that she was in any way surprised by the Court's sentence nor did she use her opportunity to allocute to raise any of her alleged concerns with the Court. The petitioner is simply not credible on this issue. [8] The petitioner affirmatively testified under oath that she had reviewed the presentence report with her attorney and she may not now repudiate her response. This claim is without merit.

4. **Petitioner's claim of ineffective assistance of counsel at the appeal stage.**

The defendant alleges that she did not know that she had waived her right to appeal until a few months ago and that she would not have paid for the appeal if she had known of this waiver. This allegation flies in the face of the answers that she gave under oath in open court during her change of plea hearings on April 29, 2002, and June 3, 2002. It has also already been conclusively established that this waiver was knowing and voluntary based upon the holding in *United States v. Harwood*, 108 Fed.Appx. 344, 345-

---

[8] Although this Court has made its credibility findings totally independent of any prior finding as to petitioner's credibility, it is worth noting that United States District Judge Thomas G. Hull in his May 15, 2003 order overruling petitioner's objection concerning an offense level reduction for acceptance of responsibility specifically found "that her testimony is not worthy of belief."

346 (6th Cir.2004), in which the Sixth Circuit found as follows:

> Upon review, we conclude that Harwood may not appeal her
> sentence because she expressly waived her right to do so upon
> execution of her written plea agreement. Pursuant to the terms
> of the plea agreement, Harwood specifically agreed "not to
> appeal her plea of guilty or the sentence imposed by the Court."
> Although the plea agreement recommended that Harwood
> receive a three-level decrease in her offense level for accep-
> tance of responsibility, the agreement expressly stated that any
> sentencing recommendations "are not binding on the probation
> office or the Court." In addition, during the plea colloquy, the
> district court mentioned Harwood's waiver of her right to appeal
> her sentence pursuant to the terms of the plea agreement and
> questioned Harwood as to her assent to such provision. In
> response, Harwood acknowledged the existence of the waiver
> provision and indicated that she had discussed it with her
> attorney.

The Sixth Circuit then concluded:

> Harwood expressly waived her right to appeal her sentence in
> the plea agreement. Nothing in the district court record suggests
> that Harwood's assent to the waiver provision was unknowing
> or involuntary. Indeed, Harwood does not claim that her guilty
> plea was unknowingly and involuntarily entered. Under these
> circumstances, Harwood expressly waived her right to appeal
> her sentence when she executed the plea agreement.

Therefore, Harwood's allegations in regard to the waiver on appeal are factually

inaccurate, not credible and are frivolous.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the petitioner's

Motion to Vacate, Correct or Set Aside a Sentence Pursuant to 28 U.S.C. § 2255 is

**DENIED**. [Doc. 1].

Inasmuch as the petitioner did not allege a subtantial showing of the denial of a constitutional right, it is also hereby **ORDERED** that the petitioner is **DENIED** a certificate of appealability.  Fed. R. App. P.  22(b); *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063 (6th Cir. 1996).   Based on the financial information available, the Court also finds that the petitioner is indigent for purposes of appeal.  *Kincade v. Sparkman*, 117 F.3d 949 (6th Cir. 1997).

SO ORDERED.

E N T E R:

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE